FILED

2009 JUN 30 PM 2: 56

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

WILLARD K. TOM
GENERAL COUNSEL

JENNIFER M. BRENNAN
Cal. Bar No. 225473, jmbrennan@ftc.gov
STACY R. PROCTER
Cal. Bar No. 221078, sprocter@ftc.gov
JOHN D. JACOBS
Cal. Bar No. 134154, jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380

EVAN ROSE
Cal Bar No. 253478, erose@ftc.gov
KENNETH H. ABBE
Cal. Bar No. 172416, kabbe@ftc.gov
MATTHEW D. GOLD
NY Bar No. 2073963, mgold@ftc.gov
FEDERAL TRADE COMMISSION
901 Market St., Suite 570
San Francisco, CA 94103
Tel: (415) 848-5100; Fax: (415) 848-5184

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CBM
(FFMx)

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN BECK AMAZING PROFITS, LLC, a California limited liability company; JOHN ALEXANDER, LLC, a California limited liability company; JEFF PAUL, LLC, a California limited liability company, also d/b/a SHORTCUTS TO MILLIONS, LLC; MENTORING OF AMERICA, LLC, a California limited liability company; FAMILY PRODUCTS, LLC, a California limited liability company; DOUGLAS GRAVINK, an individual; GARY HEWITT, an individual; JOHN BECK, an individual; JOHN ALEXANDER, an individual; and JEFF PAUL, an individual,<br><br>Defendants. | Case no. CV09-4719<br><br>COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF |

Plaintiff Federal Trade Commission ("FTC" or "Commission") for its complaint alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain preliminary and permanent injunctive relief, rescission of contracts, restitution, disgorgement, and other equitable relief for Defendants' deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as amended by 68 Fed. Reg. 4580, 4669 (January 29, 2003).

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.     Venue is proper in this district under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b), and (c).

## PLAINTIFF

4.     Plaintiff **Federal Trade Commission** is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The Commission is charged with, *inter alia*, enforcing Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC is also charged with enforcing the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing acts or practices.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case,

1  including rescission of contracts, restitution, and disgorgement.  15 U.S.C.

2  §§ 53(b), 57b, 6102(c), and 6105(b).

3  DEFENDANTS

4      5.      Defendant **John Beck Amazing Profits, LLC**, is a California limited

5  liability company with its principal place of business at 7030 Hayvenhurst, Van

6  Nuys, CA 91406.  John Beck Amazing Profits, LLC markets the John Beck

7  system.  John Beck Amazing Profits, LLC transacts or has transacted business

8  within the Central District of California.

9      6.      Defendant **John Alexander, LLC** is a California limited liability

10  company with its principal place of business at 7030 Hayvenhurst, Van Nuys, CA

11  91406.  John Alexander, LLC markets the John Alexander system.  John

12  Alexander, LLC transacts or has transacted business within the Central District of

13  California.

14      7.      Defendant **Jeff Paul, LLC** is a California limited liability company

15  with its principal place of business at 7030 Hayvenhurst, Van Nuys, CA 91406.

16  Jeff Paul, LLC also does business as Shortcuts to Millions, LLC.  Jeff Paul, LLC

17  markets the Jeff Paul system.  Jeff Paul, LLC transacts or has transacted business

18  within the Central District of California.

19      8.      Defendant **Mentoring of America, LLC** is a California limited

20  liability company with its principal place of business at 7030 Hayvenhurst, Van

21  Nuys, CA 91406.  Mentoring of America, LLC telemarkets and sells personalized

22  coaching programs for the John Beck, John Alexander, and Jeff Paul systems that

23  purportedly teach consumers to earn more money faster than if they use these

24  systems without the coaching programs.  Mentoring of America, LLC transacts or

25  has transacted business within the Central District of California.

26      9.      Defendant **Family Products, LLC** is a California limited liability

27  company with its principal place of business at 7030 Hayvenhurst, Van Nuys, CA

28  91406.  Family Products, LLC is the sole member of Defendants John Beck

1  Amazing Profits, LLC; John Alexander, LLC; and Mentoring of America, LLC.
2  Family Products, LLC transacts or has transacted business within the Central
3  District of California.

4      10.    Family Products, LLC advertises, markets, telemarkets, and sells
5  "John Beck's Free & Clear Real Estate System" (the "John Beck system") that
6  purports to teach consumers how to purchase homes for "pennies on the dollar" at
7  government tax sales and then earn substantial amounts of money by selling or
8  renting the homes for profit.

9      11.    Family Products, LLC also advertises, markets, telemarkets, and sells
10  "John Alexander's Real Estate Riches in 14 Days" (the "John Alexander system")
11  that purports to teach consumers how to earn substantial amounts of money using
12  a so-called "inverse purchase system."

13      12.    Family Products, LLC also advertises, markets, telemarkets, and sells
14  "Jeff Paul's Shortcuts to Internet Millions" (the "Jeff Paul system") that purports
15  to teach consumers how to earn substantial amounts of money through proven,
16  turnkey Internet-based businesses.

17      13.    Defendants **Gary Hewitt** and **Douglas Gravink** are the sole
18  members of Defendants Family Products, LLC and Jeff Paul, LLC also d/b/a
19  Shortcuts to Millions.  Hewitt and Gravink both reside in the Central District of
20  California and transact business there.  At all times material to this complaint,
21  Hewitt and Gravink have formulated, directed, controlled, participated in, assisted
22  in, or facilitated the acts or practices set forth in this complaint.

23      14.    Hereinafter, the term "**Defendants**" refers to John Beck Amazing
24  Profits, LLC; John Alexander, LLC; Jeff Paul, LLC; Mentoring of America, LLC;
25  Family Products, LLC; Gary Hewitt; and Douglas Gravink.

26  SYSTEM INVENTOR DEFENDANTS

27      15.    Defendant **John Beck** ("Beck") created the John Beck system.  Beck
28  also helped create and is featured in the infomercial for the John Beck system,

4

which has been broadcast in the Central District of California.  Beck has transacted business within the Central District of California.  At all times material to this complaint, Beck has formulated, directed, controlled, participated in, assisted in, or facilitated the acts or practices set forth in this complaint as alleged in Count One.

16.    Defendant **John Alexander** ("Alexander") created the John Alexander system.  Alexander also helped create and is featured in the infomercial for the John Alexander system, which has been broadcast in the Central District of California.  Alexander has transacted business within the Central District of California.  At all times material to this complaint, Alexander has formulated, directed, controlled, participated in, assisted in, or facilitated the acts or practices set forth in this complaint as alleged in Count Three.

17.    Defendant **Jeff Paul** ("Paul") created the Jeff Paul system.  Paul also helped create and is featured in the infomercial for the Jeff Paul system, which has been broadcast in the Central District of California.  Paul has transacted business within the Central District of California.  At all times material to this complaint, Paul has formulated, directed, controlled, participated in, assisted in, or facilitated the acts or practices set forth in this complaint as alleged in Count Five.

18.    Hereinafter, the term "**Inventor Defendants**" refers to John Beck, John Alexander, and Jeff Paul.

COMMON ENTERPRISE

19.    Defendants John Beck Amazing Profits, LLC; John Alexander, LLC; Jeff Paul, LLC also d/b/a Shortcuts to Millions, LLC; Mentoring of America, LLC; and Family Products, LLC (the "**Corporate Defendants**") have operated together as a common enterprise while engaging in the deceptive acts and practices described herein, through an interrelated network of companies that have common ownership, officers, managers, addresses, and/or business functions.

20.    Individual Defendants Hewitt and Gravink have formulated, directed,

controlled, had authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

COMMERCE

21.     At all times material to this complaint, the Defendants and the Inventor Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

DEFENDANTS' BUSINESS PRACTICES

**Introduction**

22.     Defendants have marketed, via infomercials aired nationwide and Internet websites, the John Beck, John Alexander, and Jeff Paul systems.  Each infomercial advertises a "system" that costs $39.95, plus shipping and handling costs.  The systems consist of written materials, DVDs, and/or CDs.  Consumers usually order one of the systems by calling a toll-free telephone number appearing in the infomercial advertising that system.  Consumers may also order the systems via websites located at www.johnbeck.tv, www.johnalexander.tv, and www.jeffpaul.tv.  Thousands of consumers across the United States have purchased the John Beck, John Alexander, or Jeff Paul system from Defendants.

23.     Defendants' telemarketers conduct outbound and inbound telephone calls in which they offer personal coaching services to consumers who have previously purchased any of the three systems.  The personal coaching services for the three systems range in price from as little as $195 to as much as $14,995.  Thousands of consumers across the United States have purchased personal coaching services for the John Beck, John Alexander, or Jeff Paul system from Defendants

**John Beck's Free & Clear Real Estate System**

24.     Since at least January 2004,  Defendants have aired at least two versions of the "John Beck's Free & Clear Real Estate System" infomercial.  The infomercial for the John Beck system has at times been the most frequently

6

broadcast infomercial in the United States.

25.    The John Beck system infomercials represent that consumers located anywhere in the United States can use the John Beck system to quickly and easily earn substantial amounts of money by purchasing homes, at tax sales in their area, "free and clear" for just "pennies on the dollar," and then turning around and selling these homes for full market value, or renting them out for a profit.

26.    For example, one version of the John Beck infomercial, which aired from at least 2005 through September 2007 (the "2005 infomercial"), opens with a picture of a home and a voiceover that says:

> ANNOUNCER: How would you like to own this home [picture of home shown] for just $534? Now, we're not talking about a down payment of $534 with hundreds of dollars in mortgage payments on top of that every month. That's right. We're talking about owning this home, free and clear of any monthly mortgage payments, for just $534.

After showing a photo of a different home, the voiceover then states:

> ANNOUNCER: Or this one for only $200? [picture of home shown] All of these homes and the many more examples you'll see throughout this program were all purchased for pennies on the dollar at local government tax sales that most people don't even know exist.

Later, a consumer endorser states:

> FEMALE: You can buy property for $200 to $300 and turn around and sell it for several thousand dollars. [pictures of homes shown] You can do it consistently, you can do it over and over again, and you can do it in all 50 states.

The infomercial voiceover later states:

> ANNOUNCER:  In Real Estate for Pennies on the
> Dollar, you'll learn how to immediately take advantage
> of these little known government tax sales to purchase
> homes for as little as two to three cents on the dollar and
> own them free and clear.  You can live in these homes
> [pictures of homes shown] yourself with no mortgage
> payments, resell them for unbelievable profits, or rent
> them out to generate a great source of extra spendable
> cash.  There are currently well over a million tax sale
> properties available in counties all across America and
> John Beck's North American Tax Sale Directory will
> give you everything you need to locate the upcoming tax
> sales in your area.

John Beck later states:

> JOHN BECK:  That's correct.  You see, right now, the
> cities and counties need to get rid of these properties so
> badly that they've gone out of their way to make it easy
> to buy them.  A lot of counties in the U.S. now even
> allow you to buy tax sale properties online.

27.   A more recent version of the infomercial, which began airing in about October 2007 (the "2007 infomercial"), also opens with a picture of a home and a voiceover that says:

> ANNOUNCER: The average home in America now
> costs more than $219,000.  But you're about to learn
> how you can start buying homes like these [pictures of
> homes shown] for just a few hundred dollars and own
> them free and clear with no additional monthly

8

payments.

While the voiceover is speaking, several pictures of homes are shown, along with the following superscripts: "Purchased for only $531.96"; "Purchased for only $336.73"; and "Purchased for only $166.18."

28.    The infomercial later states:

>MICHELLE BOUDREAU: I'd like to introduce you to John Beck, the man who, believe it or not, can teach you how you can buy homes all across the country for as little as just a few hundred dollars.

>* * *

>ANNOUNCER:  John's property vault is filled with a nationwide list of more than 2.2 million of the most up-to-date government tax foreclosure properties available. In just minutes, you can pick the area you're interested in and find the perfect properties for you.

>* * *

>ANNOUNCER: Government tax foreclosure sales are coming to your area – offering you the opportunity to purchase homes like these [pictures of homes shown] by simply paying off the back taxes.  While the voiceover is speaking, pictures of homes are shown, with superscript stating, "Purchased for Only $553.80 With No Monthly Payments!" and "Purchased for only $317.67 With No Monthly Payments!"

29.    Although the infomercial mentions that the John Beck system can be used to purchase other types of property (such as unimproved land), the emphasis in the infomercial is clearly on using the system to buy homes.

30.    Both John Beck infomercials show many images of homes that were

1  supposedly acquired "free and clear" for just "pennies on the dollar" using the
2  John Beck system.  Images of homes are also shown in the background while
3  consumer endorsers are speaking.  During each thirty-minute John Beck
4  infomercial, images of homes are shown more than seventy times, a rate of
5  approximately one home every 26 seconds.

6      31.    Superimposed on many of the images of homes shown in the John
7  Beck infomercials are the supposed purchase price and, in some instances, the
8  supposed assessed value of the homes.  According to the infomercials, virtually all
9  of the homes shown were purchased for less than $1,000 each at government tax
10  sales.  The infomercials show assessed values ranging from $55,000 to more than
11  $200,000.  All or nearly all of the homes shown were supposedly purchased for
12  only two or three pennies on the dollar.

13      32.    The John Beck infomercials contain numerous express claims about
14  the potential earnings consumers can expect if they purchase and use the John
15  Beck system.  For example, the infomercials show Inventor Defendant Beck and
16  consumer endorsers making statements such as:

17          MALE: I've only been using John's system for three
18          months and already profited over $50,000.
19                      * * *
20          MALE: I started with only 200 dollars and now I've
21          made over $400,000 profit!
22                      * * *
23          FEMALE: We've only been using John's system for a
24          short amount of time and we've already completed two
25          deals and we've put over $27,000 in our bank account.
26                      * * *
27          JOHN BECK: This little home was purchased for just
28          $388.90 and was resold for $55,000.

1          * * *

2          FEMALE:  We have made an astronomical amount of

3          money and it's very easy to do.  Last year, we made over

4          $500,000.

5          * * *

6          JOHN BECK: Michelle, my system gives you all the

7          information you need to cash in on these government tax

8          foreclosure properties.  And with so many properties

9          available right now, there's plenty of room for all of us

10         to make a lot of money.

11    33.   Both John Beck infomercials also represent that consumers who

12 purchase the John Beck system will receive a free 30-day membership to John

13 Beck's "Property Vault."  The infomercial states that the John Beck Property

14 Vault contains:

15         [A] nationwide list of more than 1.8 million of the most

16         up-to-date tax sale properties currently available.

17         Simply pick the area you're interested in and select the

18         perfect tax sale property for you [2005 infomercial];

19         * * *

20         [A] nationwide list of more than 2.2 million of the most

21         up-to-date government tax foreclosure properties

22         available.  In just minutes, you can pick the area you're

23         interested in and find the perfect properties for you.

24         [2007 infomercial].

25    34.   Neither infomercial discloses that the Property Vault is actually a

26 continuity plan, and that once the 30-day free Property Vault membership expires,

27 consumers will be charged $39.95 per month unless they take the affirmative step

28 of contacting Defendants to cancel their memberships.

35.     When consumers call the toll-free number shown in the infomercials to order the John Beck system, they are guided through an automated ordering system in which they provide billing and shipment information in response to pre-recorded prompts.  When consumers call to order the John Beck system, a recording states:

> Thank you for calling John Beck Free and Clear.  In John's easy-to-follow, simple course, you will quickly learn how to buy homes, land, and property for pennies on the dollar.  Just imagine what it would be like to purchase a home like you've seen on John's show for $300.  How about making an additional $1,000, $2,000, or even $5,000 a month?  John's entire money-making kit is only $39.95 plus shipping and handling, and for placing your order by credit card, you will receive membership in John's Property Vault for thirty days, absolutely free.

36.     At no point before consumers provide their payment information as part of the automated ordering process do Defendants disclose that the Property Vault is actually a continuity plan, and that once the 30-day free membership expires, consumers will be charged $39.95 per month unless they contact Defendants to cancel their memberships.  At no point prior to providing their payment information do consumers give their consent to be charged for their memberships in the Property Vault once the 30-day free memberships expire.

37.     After consumers' 30-day free memberships expire, unless consumers have taken affirmative steps to cancel, Defendants automatically charge consumers' credit cards $39.95 per month.  In numerous instances, consumers are unaware they have been charged for the Property Vault memberships until they notice the $39.95 charges on their credit card statements.

38.     Consumers who purchase the John Beck system receive a kit

containing a DVD and several informational booklets, in written and/or electronic format.

39.     The John Beck materials explain that, at most government tax sales, either tax liens or tax deeds are sold.  A tax lien is a lien imposed on real property to secure the unpaid taxes; it does not transfer title.  Therefore, it is impossible to purchase a tax lien at a tax sale and then immediately possess the underlying property "free and clear."  Rather, the delinquent taxpayer is given a "right of redemption," a time period during which he or she may repay the purchaser of the tax lien the amount of the lien (plus interest), and thereby reclaim the property. The time period for a right of redemption varies from state to state; it can range from six months to as long as three years.  If the delinquent taxes are not repaid, then the purchaser of the lien may exchange the lien for title to the property.  A tax deed, on the other hand, conveys title to the property to its purchaser.

40.     The John Beck system materials themselves reveal that the representation in the John Beck infomercials that consumers located anywhere in the United States can purchase homes, at tax sales in their area, "free and clear" for just "pennies on the dollar," is false.  In fact, in a majority of states, it is almost impossible to simply walk into a government tax sale, pay a few hundred dollars in back taxes, and walk out with a "free and clear" deed to a home, because the law of those states dictates otherwise.

41.     The John Beck materials explain that about half of the 50 states generally sell only tax liens, not deeds, at government tax sales.  While purchasers of liens may earn a return on their investment, because of the right of redemption, they do not immediately, if ever, acquire title to the property.

42.     Of the remaining states, deeds usually are sold, but opportunities to acquire homes free and clear for pennies on the dollar in these states are limited. Some of these "tax deed" states have laws mandating that the opening bids begin at some percentage of the property's assessed value (thus not just for the back

13

taxes). Others sell deeds, but provide for a right of redemption, meaning, as with lien states, that the delinquent taxpayer has a time period, sometimes as much as three years, during which he or she may repay the cost of the deed, plus interest, and reclaim the property. In addition, the John Beck materials acknowledge that unless a consumer is one of few (or the only) bidder at a tax deed sale, the purchase prices at tax sales are often bid up very quickly.

43.     The John Beck system materials also state that it is rare to find homes available at government tax sales. The John Beck materials explain that, if there is a home on the property secured by a mortgage, it is "extremely unlikely" that the person or bank holding that mortgage will not pay the delinquent taxes in order to preserve their security interest in the property. The materials advise consumers who wish to find a home at a government tax sale to search for abandoned properties.

44.     The representation in the John Beck infomercials that consumers located anywhere in the United States can purchase homes, at tax sales in their area, "free and clear" for just "pennies on the dollar," is also unsubstantiated. The consumer endorsers shown in the infomercials are not representative of consumers who purchase and use the John Beck system, because, even if they earned money, they did not do it in the way the infomercial describes. Few, if any, of the consumer endorsers earned money by purchasing homes at government tax sales "free and clear" for only a few "pennies on the dollar" and then renting them out or selling them for profit. None of the consumer endorsers shown in the infomercial purchased any of the homes shown in the infomercial. In addition, many of the consumer endorsers had prior experience in real estate, or were personally coached by Inventor Defendant John Beck.

45.     None of the homes shown in the infomercials was purchased by someone who had previously purchased the John Beck system. None of the homes shown in the infomercials was purchased at a government tax sale. All of

the homes shown are located in Oklahoma, which is a "tax lien" state.  The homes were acquired via tax liens, meaning, someone purchased a tax lien at a tax sale, waited out the redemption period, which was sometimes as long as two years, and then applied for a tax deed to acquire title to the home.  Furthermore, none of the homes shown in the John Beck infomercial was purchased for the price shown.  In fact, the purchasers of the tax liens had to pay hundreds, and sometimes thousands, more before they could take ownership of the homes.

46.     Consumers cannot routinely purchase homes at government tax sales for the dollar amounts shown in the John Beck infomercials.  Few, if any, consumers have been able to use the John Beck system to purchase homes "free and clear" for "pennies on the dollar" at government tax sales in their area.  As a result, few, if any, consumers who purchase and use the John Beck system have been able to earn substantial amounts of money renting or selling homes purchased at government tax sales.

47.     Few, if any, consumers who purchase and use the John Beck system quickly and easily earn substantial amounts of money.  Most consumers who purchase the John Beck system do not make any money at all.  Thus, the representation in the John Beck infomercials that consumers who purchase and use the John Beck system are likely to quickly and easily earn substantial amounts of money with little financial investment is false and unsubstantiated.

**John Alexander's Real Estate Riches in 14 Days**

48.     From approximately November 2005 until approximately mid-2007, Defendants aired the "John Alexander's Real Estate Riches in 14 Days" infomercial.

49.     The infomercial represents that the John Alexander system is a proven money-making system that will teach consumers how to quickly and easily earn substantial amounts of money in real estate by using a so-called "inverse purchase" method, in which consumers put together real estate transactions and

get "the cash out at closing" without using any of their own money or credit.  The John Alexander infomercial represents that consumers will be able to complete an inverse purchase transaction within 14 days.

50.     The John Alexander infomercial contains numerous claims about the potential earnings consumers can expect if they purchase and use the John Alexander system.

51.     For example, the infomercial shows Inventor Defendant Alexander as well as consumer endorsers making statements such as:

> MALE: Last year, I made over a million dollars.

> * * *

> MALE: John's system for making money at real estate is the best system that I've ever seen.  In one month, I was able to make $54,000.  The past seven months so far this year, I've made well over $93,000, and all of that is working part-time.

> * * *

> MALE: As a police officer, I had to work a lot of overtime to make $30,000 a year.  Since I've come across John's system, I've made over $100,000 a year at 10 hours a week.  It's a wonderful thing.  I've never worked so little for so much.

> * * *

> JOHN ALEXANDER: Right now, I'm standing in front of a home that I made $26,788.45 profit on using my system, and I put this deal together in just 14 days.

> * * *

> JOHN ALEXANDER: And I made $22,348.65 profit on this home deal and, of course, I didn't use any of my own money to do it.  And I'm here today telling you without any doubt that you could be doing this, too.

* * *

JOHN ALEXANDER: Once you learn the secrets found in my
system, there will be no holding you back.  You'll be making
deals like this all the time, guaranteed.

52.     The John Alexander infomercial repeatedly represents that the inverse
purchase system is easy.  For example, a large superscript, shown several times,
states, "SIMPLE STEP BY STEP SYSTEM!  ANYBODY CAN DO IT!"  The
consumer endorsers and Inventor Defendant Alexander reinforce this theme:

MALE: It's an easy program to follow.  It's laid out step
by step and anybody can follow it and anybody can do it.
[repeated three times throughout infomercial]

* * *

FEMALE: It was so easy, it was shocking.

* * *

JOHN ALEXANDER: My system can make profiting at
real estate a reality and not just a dream.  When my
students complete their first transaction and get checks
for up to $10,000 and more, they call me and tell me
how excited they feel, but almost guilty because it was
just too easy to make this money.

53.     The John Alexander infomercial also repeatedly represents that
consumers do not need any cash and do not need to use their own credit in order to
use the John Alexander system.  The John Alexander infomercial makes these
representations verbally at least nineteen times during the thirty-minute
infomercial.  In most of these instances, a large block letter superscript stating
"NO MONEY! NO CREDIT NEEDED!" is shown.

54.     The John Alexander infomercial also represents that consumers who
purchase the John Alexander system will receive a free 30-day membership to

17

John Alexander's hotline advisory service, "John's Club." The John Alexander infomercial never discloses that John's Club is actually a continuity plan, and that once the 30-day free John's Club membership expires, consumers will be charged $39.95 per month unless they take the affirmative step of contacting Defendants to cancel their memberships.

55.     When consumers call the toll-free number in the infomercial to order the John Alexander system, they are guided through an automated ordering system in which they provide billing and shipment information in response to pre-recorded prompts. Before taking a consumer's payment information, the automated recording states, "if you place your order by credit card today, you receive access to John's Club, which includes John's hotline advisory service and monthly tele-seminar, for 30 days absolutely free."

56.     At no point before consumers provide their payment information as part of the automated ordering process do Defendants disclose that John's Club is actually a continuity plan, and that once the 30-day free membership expires, consumers will be charged $39.95 per month unless they contact Defendants to cancel their memberships. At no point prior to providing their payment information do consumers give their consent to be charged for their memberships in John's Club once the 30-day free memberships expire.

57.     After consumers' 30-day free memberships expire, unless consumers have taken affirmative steps to cancel, Defendants automatically charge consumers' credit cards $39.95 per month. In numerous instances, consumers are unaware they have been charged for the John's Club memberships until they notice the $39.95 charges on their credit card statements.

58.     Consumers who purchase the John Alexander system receive a kit containing a DVD and several informational booklets, in written and/or electronic format.

59.     The John Alexander system is extremely complicated. In order to

18

1   complete an inverse purchase using the John Alexander system, a consumer,

2   working as an "investor," must find, on his or her own, a "motivated" seller

3   (usually an expired listing or a home "for sale by owner").  The consumer must

4   then enter into a contract with the seller to buy the home at a price lower than the

5   seller's original asking price, with the express understanding that the consumer

6   will find another buyer willing to purchase the home for the original asking price.

7   In some instances, the consumer must pay the seller an earnest money deposit.

8   The consumer must then find a buyer willing to pay the original asking price, and

9   arrange for that buyer to obtain financing.  When the new buyer's financing is

10  approved, the consumer assigns his or her contract with the original seller to the

11  new buyer.  When the transaction closes, the consumer receives a check for the

12  difference in price as profit.

13       60.    In addition, in order to use the John Alexander system, consumers

14  must locate their own mortgage brokers, real estate attorneys, appraisers, and title

15  companies.  The John Alexander materials also assume that consumers know how

16  to find and interpret comparable home prices, are comfortable meeting in person

17  and negotiating with home sellers and purchasers, and can understand the terms of

18  contracts for the purchase and sale of real estate.

19       61.    In addition, in order to use the John Alexander system, consumers

20  must spend substantial amounts of money.  In some instances, to enter an inverse

21  purchase transaction, consumers must place an earnest money deposit, sometimes

22  as much as $1,000.  If an inverse purchase contract falls through, the earnest

23  money deposit is forfeited.  In addition, consumers must purchase advertising

24  space in their local newspapers and have signs printed to place on the properties

25  they have under contract.   Therefore, the representation in the infomercial that

26  consumers do not have to spend their own money in order to use the John

27  Alexander system is false.

28       62.    Few, if any, consumers who purchase and use the John Alexander

system quickly and easily earn substantial amounts of money with no financial investment. Most purchasers of the John Alexander system do not make any money at all. Thus, the representation in the John Alexander infomercial that consumers who purchase and use the John Alexander system are likely to quickly and easily earn substantial amounts of money with no financial investment is false and unsubstantiated.

63. The representation in the John Alexander infomercial that consumers who purchase and use the John Alexander system are likely to quickly and easily earn substantial amounts of money with no financial investment is unsubstantiated for additional reasons. Most of the transactions discussed by John Alexander himself in the infomercial are not representative of transactions of someone who purchases and uses the John Alexander system. This is because most of the profits claimed by John Alexander in the infomercial were not generated using the inverse purchase method. In addition, the consumer endorsers shown in the infomercial are not representative of consumers who purchase and use the John Alexander system because, even if they earned money, they did not do it in the way the infomercial describes. Also, many of the consumer endorsers had extensive prior experience in real estate, or were personally coached by Inventor Defendant John Alexander.

**Jeff Paul's Shortcuts to Internet Millions**

64. Since at least January 2006, Defendants have aired at least two versions of the "Jeff Paul's Shortcuts to Internet Millions" infomercial.

65. The infomercials represent that consumers who purchase the Jeff Paul system will receive proven, turnkey Internet businesses. The infomercials represent that consumers are likely to quickly and easily earn substantial amounts of money through these businesses. The Jeff Paul infomercial represents that the system is so simple that consumers do not need any prior experience with Internet businesses to make it work.

1    66.    For example, one version of the infomercial, which aired from at least
2  January 2006 through October 2008, states:

3              KELLY BRITZ:  Tina, I just wanted to thank you for
4              turning me on to this ten free Web sites opportunity.  I
5              started making money so fast, I couldn't believe it.
6              When I first got the system from you, I thought, I can't
7              do this, I don't know how to make a website or put a
8              website on the Internet, never mind how to make money
9              with ten website businesses.  But this is so totally simple.
10             TINA MILANO:  Kelly, you are so welcome.  I knew
11             you would love it.  Once I tried it and I saw how
12             incredibly easy it is to make money with these Web sites,
13             I just wanted to share it with my friends.  I know nothing
14             about computer programming, servers, uploading,
15             downloading or any of that stuff, and I made $1,300 in
16             less than one week.  And I knew if I can do it that
17             anybody can.
18                               * * *
19             ANNOUNCER:  Click once and you load your choice of
20             businesses, click twice and you load your personal
21             information, click three times and your own customized
22             website is on the Internet . . . simply choose your
23             favorite business from thousands of proven Internet
24             businesses and start making money instantly. [ON
25             SCREEN: choose from 1000's of proven Internet
26             businesses . . . easy as sending an email.]
27    67.    A later version of the infomercial, which has aired from
28  approximately October 2008, states:

21

1    ANNOUNCER: With Jeff Paul's new shortcuts, you can

2    immediately start making money on the Internet over

3    100 different ways [ON SCREEN:  NO EXPERIENCE

4    NEEDED!] even if you know virtually nothing about

5    computers or the Internet.  And Jeff's shortcuts can

6    quickly create multiple streams of automated income to

7    build up your bank account [ON SCREEN:  Account

8    Balance $50,000] 24 hours a day, seven days a week,

9    even while you're sleeping.

10                          * * *

11   STACEY HAYES: To help you make more money even

12   faster.

13   CARMEN PALUMBO: Jeff is also going to give you the

14   Ultimate Shortcut.

15   STACEY HAYES: Ten free instant website businesses

16   that are completely set up.

17   CARMEN PALUMBO: And guaranteed to make you

18   money.

19   JEFF PAUL: Your 10 free instant website businesses are

20   like little money machines that are already created for

21   you and totally run themselves.  Each website literally

22   does all the work for you.  There is no inventory to buy

23   or ship.  There is no selling or customer service to deal

24   with.  And your websites automatically deposit cash into

25   your bank account 24/7 without you doing a thing.

26        68.    The Jeff Paul infomercials also contain numerous claims about the

27   potential earnings consumers can expect if they purchase and use the Jeff Paul

28   system.  For example, the infomercials show Inventor Defendant Paul as well as

consumer endorsers making statements such as:

> FEMALE: I made $1,800 in less than one week.

> * * *

> MALE: Before I started using Jeff's shortcuts, I was doing odd jobs for $7 an hour, and now I'm making up to $110,000 a week.

> * * *

> TEXT ON SCREEN: Frank L. makes up to $40,000 a month!

> * * *

> TEXT ON SCREEN: Ron R. made over $1,000,000 with the system!

> * * *

> MALE: Okay, using Jeff's shortcuts within 72 hours, I made over $4,000.

> CARMEN PALUMBO: Four thousand dollars in just 72 hours?

> MALE: Absolutely.

> CARMEN PALUMBO: And how quickly did your income start to grow?

> MALE: Immediately.  I'm now making up to $50,000 a month.

> * * *

> JEFF PAUL: Imagine having the extra income to pay off your debts, put money away in savings or retirement accounts or just have more money to take that dream vacation and enjoy life. My system will teach you how to use the Internet to make all the money you want automatically 24/7.  You'll even make

1   money while you're on vacation because your websites never

2   stop working for you.  There's nothing better than automatic

3   money.

4   69.   The Jeff Paul infomercials also represent that consumers who

5   purchase the Jeff Paul system will receive a free 30-day membership to Jeff Paul's

6   "Big League," also known as Jeff Paul's "Internet Millionaires Club."  This is a

7   service that includes seminars and access to advisors who can answer consumers'

8   questions.  The Jeff Paul infomercials never disclose that the Big League is

9   actually a continuity plan and that, once the 30-day free membership expires,

10  consumers will be charged $39.95 per month unless they contact Defendants to

11  cancel their memberships.

12  70.   When consumers call the toll-free number in the infomercials to order

13  the Jeff Paul system, they are guided through an automated ordering system in

14  which they provide billing and shipment information in response to pre-recorded

15  prompts.  At no point before consumers provide their payment information as part

16  of the automated ordering process do Defendants disclose that the Big League is

17  actually a continuity plan, and that once the 30-day free membership expires,

18  consumers will be charged $39.95 per month unless they contact Defendants to

19  cancel their memberships.  At no point prior to providing their payment

20  information do consumers give their consent to be charged for their "Big League"

21  (aka "Internet Millionaires Club) memberships once the 30-day free memberships

22  expire.

23  71.   After consumers' 30-day free memberships expire, unless consumers

24  have taken affirmative steps to cancel, Defendants automatically charge

25  consumers' credit cards $39.95 per month.  In numerous instances, consumers are

26  unaware they have been charged for the Big League/Internet Millionaires Club

27  membership until they notice the $39.95 charges on their credit card statements.

28  72.   Consumers who purchase the Jeff Paul system receive a kit

containing a DVD and several informational booklets in written and/or electronic format.  The Jeff Paul materials do not contain step-by-step instructions for accessing or using a proven, turnkey Internet business.  Instead, the materials tell consumers to create their own informational products from scratch, and then market those products on the Internet.

73.    Consumers also discover that the "three clicks" or "instant" websites they receive with the Jeff Paul system are not the "proven" Internet businesses that are promised in the infomercial.  Rather, the websites are simplistic, basic websites, and consumers must do extensive work to enhance them, which involves learning how to edit and modify websites.  In addition, consumers discover that, after activating their "three clicks" websites, they must do all of their own marketing to potentially attract customers.  Therefore, the representation that consumers who purchase the Jeff Paul system are likely to quickly and easily earn substantial amounts of money through the proven, turnkey Internet businesses they receive is false.

74.    The consumer endorsers shown in the Jeff Paul infomercial are not representative of consumers who purchase and use the Jeff Paul system because, even if they earned money, they did not do it in the way the infomercial describes.  Few, if any, of the consumer endorsers earned money through Jeff Paul's "proven" Internet businesses.  At least one consumer endorser displays checks that are completely unrelated to the Jeff Paul system.  In addition, many of the consumer endorsers were personally coached by Inventor Defendant Jeff Paul, or were Jeff Paul's personal friends.  Therefore, the consumer endorsers fail to substantiate the infomercial's claims.

75.    Few, if any, consumers who purchase and use the Jeff Paul system quickly and easily earn substantial amounts of money.  Therefore, Defendants' representation that consumers who purchase the Jeff Paul system will quickly and easily earn substantial amounts of money from proven, turnkey Internet businesses

1  is false and unsubstantiated.

2  **Defendants' Coaching Programs**

3  76.    Included with the John Beck, John Alexander, and Jeff Paul system

4  materials is a letter inviting consumers to call a toll-free telephone number for help

5  getting started with whichever system the consumer purchased.  In numerous

6  instances, consumers call the toll-free number included in the letter and speak with

7  Defendants' telemarketers.  In numerous other instances, Defendants'

8  telemarketers call consumers who have purchased one of the systems soon after

9  the consumers receive their John Beck, John Alexander, or Jeff Paul system

10  materials. During these inbound and outbound calls, Defendants' telemarketers

11  offer consumers personal coaching services that range in price from at least $195

12  to nearly $15,000.

13  77.    Defendants' telemarketers represent that Defendants' coaching

14  programs will ensure consumers' success by holding their hands and walking them

15  "step-by-step" though the John Beck, John Alexander, or Jeff Paul system

16  (whichever the consumer ordered).

17  78.    In numerous instances, while pitching the personal coaching services,

18  Defendants' telemarketers make numerous express and implied claims about the

19  potential earnings consumers can expect if they purchase and use the coaching

20  services.  Defendants' telemarketers represent to consumers that, if consumers

21  purchase and complete Defendants' coaching services, consumers will be able to

22  earn substantial amounts of money.

23  79.    Company-approved scripts encourage consumers to use credit cards

24  to pay for the cost of the coaching.  In numerous instances, Defendants'

25  telemarketers assure consumers that they will be able to pay off the cost of the

26  coaching with profits from their new business within one or two credit card cycles.

27  80.    Defendants' telemarketers tell consumers that, if they purchase and

28  use Defendants' personal coaching services, they will complete enough

26

transactions using the John Beck, John Alexander, or Jeff Paul system (whichever the consumer ordered) to qualify for a tuition reimbursement from the Defendants of the cost of the coaching program.  Defendants' telemarketers assure consumers that they will be so successful using the John Beck, John Alexander, or Jeff Paul system that they will easily qualify for the tuition reimbursement.

81.  The net impression of all of the promises made by the Defendants' telemarketers is that if consumers purchase Defendants' personal coaching services, consumers will quickly earn back the cost or substantially more than the cost of the coaching services.

82.  Few, if any, consumers who purchase and use Defendants' personal coaching services for the John Beck, John Alexander, or Jeff Paul system earn substantial amounts of money, let alone earn money faster than if they had tried to use the system they ordered without coaching assistance.  Most purchasers of Defendants' personal coaching services do not make any money at all using the John Beck, John Alexander, or Jeff Paul systems.

83.  Virtually no consumers who purchase and use Defendants' personal coaching services qualify for reimbursement from Defendants for the cost of coaching services.  Less than 0.3% of consumers have qualified for reimbursement from Defendants of the cost of the John Beck coaching services.  Only a handful, if any, consumers have qualified for reimbursement from Defendants of the cost of the Jeff Paul coaching services.  No consumers have qualified for reimbursement from Defendants of the cost of the John Alexander coaching services.

84.  Therefore, Defendants' representations that consumers who purchase and complete the coaching program for the John Beck, John Alexander, or Jeff Paul systems will quickly earn back the cost or substantially more than the cost of the coaching program is false and unsubstantiated.

85.  In addition, in numerous instances, when consumers decline the telemarketers' offers and tell the telemarketers that they do not wish to receive any

1   additional telephone calls, the telemarketers repeatedly call back.

2                        DEFENDANTS' REVENUES

3        86.   Since January 2004, hundreds of thousands of consumers throughout

4   the United States have purchased the John Beck system, paying approximately

5   $92,000,000, including continuity plan charges.  Since November 2005, tens of

6   thousands of consumers throughout the United States have purchased the John

7   Alexander system, paying approximately $9,500,000, including continuity plan

8   charges.  Since December 2006, tens of thousands of consumers throughout the

9   United States have purchased the Jeff Paul system, paying approximately

10  $10,000,000, including continuity plan charges.

11       87.   Since January 2004, thousands of consumers throughout the United

12  States have purchased personal coaching services for all three systems.  Since

13  January 2004, consumers have paid approximately $175,000,000 for personal

14  coaching services for the John Beck system.  Since November 2005, consumers

15  have paid approximately $13,000,000 for personal coaching services for the John

16  Alexander system.  Since December 2006, consumers have paid approximately

17  $30,000,000 for personal coaching services for the Jeff Paul system.

18                 VIOLATIONS OF SECTION 5 OF THE FTC ACT

19       88.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits deceptive or

20  unfair acts and practices in or affecting commerce.  Misrepresentations or

21  omissions of material facts constitute deceptive acts or practices pursuant to

22  Section 5(a) of the FTC Act.

23                              **Count One**

24       89.   In connection with the advertising, marketing, promoting, offering for

25  sale, or sale of the John Beck system, Defendants and Inventor Defendant Beck

26  have represented, expressly or by implication, that consumers who purchase and

27  use the John Beck system are likely to:

28              a.    be able to purchase homes, at government tax sales in their

                                      28

1                      area, "free and clear" of all mortgages or liens, for just

2                      "pennies on the dollar";

3            b.     earn substantial amounts of money renting or selling homes

4                      they purchase at government tax sales; and

5            c.     quickly and easily earn substantial amounts of money with

6                      little financial investment.

7        90.    The representations set forth in Paragraph 89 are false or were not

8   substantiated at the time the representations were made.  Therefore, the making of

9   the representations in Paragraph 89 constitutes a deceptive act or practice in

10  violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

11                                **Count Two**

12       91.    In connection with the advertising, marketing, promoting, offering for

13  sale, or sale of the John Beck system, Defendants have represented, expressly or

14  by implication, that consumers who purchase the John Beck system will receive a

15  free 30-day membership to the "John Beck Property Vault."

16       92.    Defendants fail to disclose, or fail to disclose adequately, that

17  consumers who purchase the John Beck system are automatically enrolled in a

18  continuity membership plan that costs $39.95 per month, and that consumers'

19  accounts will be charged $39.95 each month unless consumers take affirmative

20  action to cancel their memberships.

21       93.    This additional information, described in Paragraph 92, would be

22  material to consumers in deciding whether to purchase the John Beck system.

23       94.    In light of the representation set forth in Paragraph 91, Defendants'

24  failure to disclose, or failure to disclose adequately, the material information set

25  forth in Paragraph 92 constitutes a deceptive act or practice in violation of Section

26  5(a) of the FTC Act, 15 U.S.C. § 45(a).

27  / / /

28

1

**Count Three**

2      95.    In connection with the advertising, marketing, promoting, offering for

3    sale, or sale of the John Alexander system, Defendants and Inventor Defendant

4    Alexander have represented, expressly or by implication, that consumers who

5    purchase and use the John Alexander system are likely to quickly and easily earn

6    substantial amounts of money with no financial investment.

7      96.    The representation set forth in Paragraph 95 is false or was not

8    substantiated at the time the representation was made.  Therefore, the making of

9    the representation in Paragraph 95 constitutes a deceptive act or practice in

10    violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

11

**Count Four**

12      97.    In connection with the advertising, marketing, promoting, offering for

13    sale, or sale of the John Alexander system, Defendants have represented, expressly

14    or by implication, that consumers who purchase the John Alexander system will

15    receive a free 30-day membership to John Alexander's "John's Club."

16      98.    Defendants fail to disclose, or fail to disclose adequately, that

17    consumers who purchase the John Alexander system are automatically enrolled in

18    a continuity membership plan that costs $39.95 per month, and that consumers'

19    accounts will be charged $39.95 each month unless consumers take affirmative

20    action to cancel their memberships.

21      99.    This additional information, described in Paragraph 98, would be

22    material to consumers in deciding whether to purchase the John Alexander system.

23      100.    In light of the representation set forth in Paragraph 97, Defendants'

24    failure to disclose, or failure to disclose adequately, the material information set

25    forth in Paragraph 98 constitutes a deceptive act or practice in violation of Section

26    5(a) of the FTC Act, 15 U.S.C. § 45(a).

27

28

1

**Count Five**

2      101.   In connection with the advertising, marketing, promoting, offering for

3 sale, or sale of the Jeff Paul system, Defendants and Inventor Defendant Paul have

4 represented, expressly or by implication, that consumers who purchase and use the

5 Jeff Paul system are likely to quickly and easily earn substantial amounts of

6 money from proven, turnkey Internet businesses.

7      102.   The representation set forth in Paragraph 101 is false or was not

8 substantiated at the time the representation was made.  Therefore, the making of

9 the representation in Paragraph 101 constitutes a deceptive act or practice in

10 violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

11

**Count Six**

12      103.   In connection with the advertising, marketing, promoting, offering for

13 sale, or sale of the Jeff Paul system, Defendants have represented, expressly or by

14 implication, that consumers who purchase the Jeff Paul system will receive a free

15 30-day membership to "Jeff Paul's Big League" (also known as "Jeff Paul's

16 Internet Millionaires Club.")

17      104.   Defendants fail to disclose, or fail to disclose adequately, that

18 consumers who purchase the Jeff Paul system are automatically enrolled in a

19 continuity membership plan that costs $39.95 per month, and that consumers'

20 accounts will be charged $39.95 each month unless consumers take affirmative

21 action to cancel their memberships.

22      105.   This additional information, described in Paragraph 104, would be

23 material to consumers in deciding whether to purchase the Jeff Paul system.

24      106.   In light of the representation set forth in Paragraph 103, Defendants'

25 failure to disclose, or failure to disclose adequately, the material information set

26 forth in Paragraph 104, constitutes a deceptive act or practice in violation of

27 Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

28

**Count Seven**

107.   In numerous instances in connection with the advertising, marketing, promoting, offering for sale, or sale of the coaching programs for the John Beck, John Alexander, and Jeff Paul systems, Defendants have represented, expressly or by implication, that consumers who purchase and complete the coaching program for the John Beck, John Alexander, or Jeff Paul systems will quickly earn back the cost or substantially more than the cost of the coaching program.

108.   The representation set forth in Paragraph 107 is false or was not substantiated at the time the it was made.  Therefore, the making of the representation in Paragraph 107 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

VIOLATIONS OF THE TELEMARKETING SALES RULE

109.   Defendants are "sellers" or "telemarketers" engaged in "telemarketing," as those terms are defined in the amended TSR, 16 C.F.R. §§ 310.2(z), (bb), and (cc).

110.   Section 310.3(a) of the Telemarketing Sales Rule ("TSR") prohibits telemarketers and sellers from, *inter alia*, failing to disclose, clearly and conspicuously and prior to a consumer paying for goods or services offered, all material terms and conditions of any negative option feature, including but not limited to the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s).  16 C.F.R. § 310.3(a)(1)(vii).

111.   Section 310.4(a) of the TSR prohibits telemarketers and sellers from engaging in abusive telemarketing acts and practices, which are defined to include, *inter alia,* causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer.  16 C.F.R. § 310.4(a)(6).

32

112.   Section 310.4(b) of the TSR prohibits telemarketers from engaging in, or sellers from causing a telemarketer to engage in certain conduct, including, *inter alia*, initiating any outbound telephone call to a person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered.  16 C.F.R. § 310.4(b)(1)(iii)(A).

113.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the TSR constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

114.   The John Beck, John Alexander, and Jeff Paul systems and the John Beck, John Alexander, and Jeff Paul coaching programs are "Investment Opportunities," as defined in the amended TSR, 16 C.F.R. § 310.2(p).  Therefore, the inbound calls made by consumers to Defendants in order to purchase the John Beck, John Alexander, and Jeff Paul systems and coaching programs are not exempt from the TSR, because such calls fall within the TSR's investment opportunity exception to the inbound call exemption.  16 C.F.R. § 310.6(b)(5).

## Count Eight

115.   In connection with the telemarketing of the John Beck system, Defendants have represented, directly or by implication, that consumers who purchase the John Beck system will receive a free 30-day membership to the "John Beck Property Vault."

116.   Defendants fail to disclose, or fail to disclose clearly and conspicuously, before a consumer pays for the John Beck system:

      a.   that consumers who purchase the John Beck system are automatically enrolled in a continuity membership plan that costs $39.95 per month;

      b.   that consumers' accounts will be charged $39.95 each month

1    unless consumers take affirmative action to cancel their

2    memberships;

3         c.    the date(s) the charge(s) will be submitted for payment; and

4         d.    the specific steps consumers must take to avoid the charges.

5        117.   Defendants' failure to disclose, or to disclose clearly and

6    conspicuously, the information set forth in Paragraph 116 constitutes a deceptive

7    telemarketing act or practice in violation of Section 310.3(a)(1)(vii) of the

8    Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(1)(vii).

9    **Count Nine**

10       118.   In connection with the telemarketing of the John Beck system,

11   Defendants have represented, directly or by implication, that consumers who

12   purchase the John Beck system will receive a free 30-day membership to the "John

13   Beck Property Vault."

14       119.   In numerous instances, after the 30-day trial period ends, Defendants

15   cause consumers' billing information to be submitted for payment without the

16   express informed consent of the customer.

17       120.   This conduct constitutes an abusive telemarketing act or practice in

18   violation of Section 310.4(a)(6) of the Telemarketing Sales Rule, 16 C.F.R.

19   § 310.4(a)(6).

20   **Count Ten**

21       121.   In connection with the telemarketing of the John Alexander system,

22   Defendants have represented, directly or by implication, that consumers who

23   purchase the John Alexander system will receive a free 30-day membership to

24   John Alexander's "John's Club."

25       122.   Defendants fail to disclose, or fail to disclose clearly and

26   conspicuously, before a consumer pays for the John Alexander system:

27        a.    that consumers who purchase the John Alexander system are

28           automatically enrolled in a continuity membership plan that

costs $39.95 per month;

    b.    that consumers' accounts will be charged $39.95 each month unless consumers take affirmative action to cancel their memberships;

    c.    the date(s) the charge(s) will be submitted for payment; and

    d.    the specific steps consumers must take to avoid the charges.

123.   Defendants' failure to disclose, or to disclose clearly and conspicuously, the information set forth in Paragraph 122 constitutes a deceptive telemarketing act or practice in violation of Section 310.3(a)(1)(vii) of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(1)(vii).

### Count Eleven

124.   In connection with the telemarketing of the John Alexander system, Defendants have represented, directly or by implication, that consumers who purchase the John Alexander system will receive a free 30-day membership to John Alexander's "John's Club."

125.   In numerous instances, after the 30-day trial period ends, Defendants cause consumers' billing information to be submitted for payment without the express informed consent of the customer.

126.   This conduct constitutes an abusive telemarketing act or practice in violation of Section 310.4(a)(6) of the Telemarketing Sales Rule, 16 C.F.R. § 310.4(a)(6).

### Count Twelve

127.   In connection with the telemarketing of the Jeff Paul system, Defendants have represented, directly or by implication, that consumers who purchase the Jeff Paul system will receive a free 30-day membership to "Jeff Paul's Big League" or "Jeff Paul's Internet Millionaires Club."

128.   Defendants fail to disclose, or fail to disclose clearly and conspicuously, before a consumer pays for the Jeff Paul system:

1          a.    that consumers who purchase the Jeff Paul system are

2              automatically enrolled in a continuity membership plan that

3              costs $39.95 per month;

4          b.    that consumers' accounts will be charged $39.95 each month

5              unless consumers take affirmative action to cancel their

6              memberships;

7          c.    the date(s) the charge(s) will be submitted for payment; and

8          d.    the specific steps consumers must take to avoid the charges.

9    129.   Defendants' failure to disclose, or to disclose clearly and

10   conspicuously, the information set forth in Paragraph 128 constitutes a deceptive

11   telemarketing act or practice in violation of Section 310.3(a)(1)(vii) of the

12   Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(1)(vii).

13   **Count Thirteen**

14   130.   In connection with the telemarketing of the Jeff Paul system,

15   Defendants have represented, directly or by implication, that consumers who

16   purchase the Jeff Paul system will receive a free 30-day membership to "Jeff

17   Paul's Big League" or "Jeff Paul's Internet Millionaires Club."

18   131.   In numerous instances, after the 30-day trial period ends, Defendants

19   cause consumers' billing information to be submitted for payment without the

20   express informed consent of the customer.

21   132.   This conduct constitutes an abusive telemarketing act or practice in

22   violation of Section 310.4(a)(6) of the Telemarketing Sales Rule, 16 C.F.R.

23   § 310.4(a)(6).

24   **Count Fourteen**

25   133.   In connection with the telemarketing of the John Beck, John

26   Alexander, and Jeff Paul coaching services, Defendants initiate or cause a

27   telemarketer to initiate an outbound telephone call to consumers who have

28   previously stated that they do not wish to receive outbound telephone calls made

1   by or on behalf of Defendants.

2       134.   This conduct constitutes an abusive telemarketing act or practice in

3   violation of Section 310.4(b)(1)(iii)(A) of the Telemarketing Sales Rule, 16 C.F.R.

4   § 310.4(b)(1)(iii)(A).

5                     <u>CONSUMER INJURY</u>

6       135.   Consumers throughout the United States have suffered and continue

7   to suffer substantial monetary loss as a result of the Defendants' and Inventor

8   Defendants' unlawful acts or practices as set forth in this Complaint.  In addition,

9   the Defendants and Inventor Defendants have been unjustly enriched as a result of

10   their unlawful acts or practices.  Absent injunctive relief from this Court, the

11   Defendants and Inventor Defendants are likely to continue to injure consumers,

12   reap unjust enrichment, and harm the public interest.

13           <u>THIS COURT'S POWER TO GRANT RELIEF</u>

14       136.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this

15   Court to grant injunctive and such other relief as the Court may deem appropriate

16   to halt and redress violations of the FTC Act.  The Court, in the exercise of its

17   equitable jurisdiction, may award other ancillary relief, including, but not limited

18   to, rescission of contracts and restitution, and the disgorgement of ill-gotten gains,

19   to prevent and remedy injury caused by the Defendants' and Inventor Defendants'

20   law violations.

21       137.   Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the

22   Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief

23   as the Court finds necessary to redress injury to consumers resulting from

24   Defendants' violations of the TSR, including rescission and reformation of

25   contracts, and the refund of money.

26                   <u>PRAYER FOR RELIEF</u>

27       138.   Wherefore, Plaintiff Federal Trade Commission, pursuant to Sections

28   13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the

Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

     a.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to an order freezing assets;

     b.      Enter permanent injunctions to prevent future violations of the FTC Act and the TSR by Defendants and to prevent future violations of the FTC Act by the Inventor Defendants;

     c.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, and from the Inventor Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

     d.      Award Plaintiff the costs of bringing this action, as well as such other and additional equitable relief as the Court may determine to be just and proper.

Dated: _June 30, 2009_                  Respectfully Submitted,

                                           WILLARD K. TOM
                                           General Counsel

                                           *Jennifer Brennan*
                                           JENNIFER M. BRENNAN
                                           STACY R. PROCTER
                                           JOHN D. JACOBS
                                           EVAN ROSE
                                           KENNETH H. ABBE

                                           Attorneys for Plaintiff
                                           Federal Trade Commission

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Frederick F. Mumm.

The case number on all documents filed with the Court should read as follows:

## CV09- 4719 CBM (FFMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Federal Trade Commission <br><br> PLAINTIFF(S) <br><br> v. <br><br> JOHN BECK AMAZING PROFITS, LLC, et al. <br> (See attached for other defendants) <br><br> DEFENDANT(S). | CASE NUMBER <br><br> CV09-4719CBM (FFMx) <br><br><br> **SUMMONS** |

TO:    DEFENDANT(S):  <u>JOHN BECK AMAZING PROFITS, LLC, et al. (See attached for other defendants)</u>

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>(see attached for attorney names)</u> , whose address is <u>(see attached for attorney addresses)</u> . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: JUN 3 0 2009

By: _Natalie Longoria_
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Federal Trade Commission | JOHN BECK AMAZING PROFITS, LLC, JOHN ALEXANDER, LLC, JEFF PAUL, LLC, also d/b/a SHORTCUTS TO MILLIONS, LLC; MENTORING OF AMERICA, LLC, FAMILY PRODUCTS, LLC, DOUGLAS GRAVINK, GARY HEWITT, JOHN BECK, JOHN ALEXANDER, and JEFF PAUL |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) | |
|---|---|---|
| See Attachment 2 | Jennifer C. Archie<br>Latham & Watkins LLP<br>555 Eleventh Street, NW, Ste. 1000<br>Washington, D.C. 20004-1304<br>(202) 637-2200 | Larry C. Russ<br>Russ, August & Kabat<br>12424 Wilshire Boulevard, 12th Floor<br>Los Angeles, CA 90025<br>(310) 826-7474 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No        ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 53(b); 15 U.S.C. § 57b; 15 U.S.C. §§ 6101-6108; Violations of 15 U.S.C. § 45(a), and violations of Telemarketing Sales Rule, 16 C.F.R. Part 310

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | IMMIGRATION | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |

# CV09-4719

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**